RESIDENTIAL FUNDING COMPANY,               CIVIL NO. 13-3518 (MJD/JSM)
LLC,

     Plaintiff,

v.                                                              <u>REPORT AND RECOMMENDATION</u>

GATEWAY BANK, F.S.B.,

     Defendant.

This matter came before the undersigned on defendant Gateway Bank, F.S.B.'s Motion to Dismiss for Failure to State a Claim [Docket No. 19] and Motion to Dismiss Plaintiff's First Amended Complaint [Docket No. 46]. David Elsberg, Esq., Donald G. Heeman, Esq., David Elsberg, Esq., Isaac Nesser, Esq. and Michael Beekhuizen, Esq. appeared on behalf of plaintiff. Carol Moss, Esq. and Greg Chambers, Esq. appeared on behalf of defendant.

This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(A), (B) and Local Rule 72.1(c).

## I.     BACKGROUND

On December 15, 2013, plaintiff Residential Funding Company ("RFC") initiated the present action against Gateway Bank, F.S.B ("Gateway"). <u>See</u> Docket No. 1. On March 3, 2014, Gateway brought its initial motion to dismiss. <u>See</u> Docket No. 19. On March 24, 2014, Residential filed a First Amended Complaint pursuant to Rule

15(a)(1)(B) of the Federal Rules of Civil Procedure.[1] <u>See</u> Docket No. 41. The First Amended Complaint is the operative complaint in this case. Therefore, Defendant Gateway's motion to dismiss [Docket No. 19], which applies to the original Complaint, should be denied as moot.[2]

On April 7, 2014, Gateway brought the instant motion to dismiss plaintiff's First Amended Complaint. <u>See</u> Docket No. 46.

The facts bearing on Gateway's motion to dismiss as alleged in the First Amended Complaint are as follows: when the instant case was filed, RFC was a wholly owned subsidiary of GMAC Residential Holding Company, LLC. <u>See</u> First Amended Complaint, ¶ 13. Under the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et. al. and the Official Committee of Unsecured Creditors*, Case No. 12-12020 (MG) (Bankr. S.D.N.Y.) [D.I. 6065-1] (the "Plan"), GMAC Residential Holding Company, LLC's interest in RFC was cancelled and the ResCap

---

[1]    Rule 15(a)(1)(B) provides in relevant part:

> **(1) Amending as a Matter of Course.** A party may amend its pleading once as a matter of course within:
>
> * * *
>
> **(B)** if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.

 Fed. R. Civ. P. 15(a)(1)(B) (emphasis in original).

[2]    "It is well-established that an amended complaint supersedes an original complaint and renders the original complaint without legal effect." <u>In re Atlas Van Lines, Inc.</u>, 209 F.3d 1064, 1067 (8th Cir. 2000) (citing <u>Washer v. Bullitt Cnty.</u>, 110 U.S. 558, 562, (1884)); <u>see</u> <u>also</u> <u>Pure Country, Inc. v. Sigma Chi Fraternity</u>, 312 F.3d 952, 956 (8th Cir. 2002) ("If anything, [plaintiff]'s motion to amend the complaint rendered moot [the defendant]'s motion to dismiss the original complaint.").

Liquidating Trust obtained all of RFC's rights and interests under RFC's Agreement with Gateway, and now controls RFC. Id. Gateway is a federally regulated savings bank. Id., ¶ 14.

RFC was in the business of acquiring and securitizing residential mortgage loans from "correspondent lenders" and distributing those loans by either pooling them together with other similar mortgage loans to sell to residential mortgage-backed securitization ("RMBS") trusts, or by selling them to whole loan purchasers. Id., ¶¶ 2, 3. Gateway sold over 350 mortgage loans to RFC pursuant to the Correspondent Client Agreement between the parties. Id., ¶ 17, Ex. A (Correspondent Client Agreement). The Correspondent Client Agreement incorporated the terms and conditions of RFC's Client Guide. Id., ¶ 18. According to RFC, the entire versions of the Client Guide are known to the parties and, as a result, RFC did not attach complete copies of the voluminous Client Guide to the Amended Complaint. Id. Instead, RFC attached relevant excerpts as examples. Id., Exs. B-1 through B-7. Together, the Correspondent Client Agreement and Client Guides formed the parties' "Agreement," and dictated the standards to which Gateway's loans sold to RFC were to adhere. Id., ¶ 18.

The mortgage loans sold by Gateway to RFC pursuant to the Agreement, and securitized by RFC, had an original principal balance exceeding $83 million. Id., ¶ 19, Ex. C (Preliminary List of Loans Sold by Gateway to RFC). As the lender, Gateway was responsible for collecting information from the borrower, verifying its accuracy, and underwriting the loan. Id., ¶ 20. The parties understood that Gateway had primary responsibility for all aspects of the underwriting of the loan, and that RFC would generally not be re-underwriting the loan. Id. Gateway knew of RFC's intention to

securitize or sell the loans, and, represented that it "recognizes that it is [RFC's] intent to securitize some or all of the Loans sold to [RFC]. Id., ¶ 23, Ex. B (Client Guide A202). Gateway also knew that RFC sold pools of loans to whole loan investors. Id., ¶ 22.

Pursuant to the Agreement, Gateway made a number of material representations and warranties with respect to the loans it sold to RFC, including: (a) Gateway's "origination and servicing of the Loans have been legal, proper, prudent and customary and have conformed to the highest standards of the residential mortgage origination and servicing business" (Client Guide A201(K)); (b) Gateway "will comply with all provisions of this Client Guide and the Program Documents, and will promptly notify GMAC-RFC of any occurrence, act, or omission regarding [Gateway], the Loan, the Mortgaged Property or the Mortgagor of which [Gateway] has knowledge, which . . . may materially affect [Gateway], [or] the Loan" (Client Guide A201(M)); (c) "[a]ll information relating to each Loan delivered and sold to GMAC-RFC is true, complete and accurate and there are no omissions of material facts. All data provided by the Client to GMAC-RFC relating to any Loan, whether in electronic format, or otherwise, is true and complete and accurately reflects the information in the related Loan file" (Client Guide A202(A)); (d) "[a]ll Loan Documents, Funding Documents and Final Documents," along with the originals and copies of such documents are "genuine," "properly executed," "complete and accurate" as required by the Client Guide (Client Guide A202(D)); (e) all loan documents are in compliance with all state and local laws (Client Guide A202(D)); (f) "[t]here is no default, breach, violation or event of acceleration existing under any Note or Security Instrument transferred to" RFC (Client Guide A202(G)); (g) "each Loan has been originated, closed, and transferred in compliance

with all applicable local, State and federal laws and regulations" (Client Guide A202(I));
(h) "[n]o Loan is a . . . loan considered a 'high-cost,' covered, 'high-risk,' 'predatory' or
any other similar designation under any State or local law in effect at the time of the
closing of the loan" (Client Guide A202(J)(1)(d)); (i) "[n]o circumstances exist involving
the Loan Documents, the Mortgaged Premises or the Borrower's credit standing that
could (i) cause private institutional investors to regard the Loan as an unacceptable
investment, (ii) cause the Loan to become delinquent, or (iii) adversely affect the Value
or marketability of the Mortgaged Premises or the Loan" (Client Guide A202(Q)); (j) "the
Loan is of investment quality, has been prudently originated and has been underwritten
in compliance with all requirements" of the Client Guide (Client Guide A202(T)); (k) the
appraisal for each loan "was made by an appraiser who meets the minimum
qualifications for appraisers as specified in this Client Guide" (Client Guide A202(T)); (l)
"for each Loan, as of the Funding Date, the market Value of the Mortgaged Premises is
at least equal to the appraised value stated on the Loan appraisal" (Client Guide
A202(T)); and (m) "[n]o fraud or misrepresentation by the Borrower or by the [Gateway],
broker, correspondent, appraiser or any independent contractor retained by [Gateway],
broker, correspondent, appraiser or any employee of any of the foregoing occurred with
respect to or in connection with the origination or underwriting of any Loan and all
information and documents provided to GMAC-RFC in connection with the Loan are
complete and accurate" (Client Guide A202 (KK)).  First Amended Complaint, ¶¶ 24, 25.

These representations and warranties were material because RFC in turn sold
these loans to trusts and whole loan investors, making its own representations and

warranties to the trusts and investors, and thereby exposing itself to liability to these third parties. Id., ¶ 25.

Under the Client Guide, failure to comply with these representations and warranties or any of the other requirements, terms or conditions of the Client Guide, including failure to provide RFC with true, accurate and complete information in a timely manner, constituted an "Event of Default." Id., ¶ 26. Similarly, it was an "Event of Default if the "[b]orrower or any other person or entity involved in the loan transaction or its underwriting" made a false representation, or failed to provide true, complete and accurate information in connection with a loan transaction. Id., ¶ 27 (citing Client Guide A208).

RFC remedies in the event of a default included any remedy "allowed by law or in equity," and included repurchase of the defective loan, substitution of another loan for the defective one, or indemnification against losses resulting from such breaches, including all reasonable attorney's fees and other costs and expenses incurred in connection with enforcement of its rights under the Agreement. Id., ¶¶ 28, 29 (citing Client Guide A209(C), A210). Nothing in the Agreement required RFC to provide Gateway with notice and an opportunity to cure the defects, to make a repurchase demand, or in any way restricted RFC from pursuing recovery for materially defective loans at any time, and RFC had the sole discretion to declare an Event of Default. Id., ¶ 30 (citing Client Guide A210(B)).

In addition to the representations and warranties Gateway made to RFC, Gateway agreed to indemnify RFC from all liabilities:

> arising from (i) any act or failure to act, (ii) any breach of warranty, obligation or representation contained in the Client

Guide, (iii) any claim, demand, defense or assertion against or involving GMAC-RFC based on or resulting from such breach, (iv) any breach of any representation, warranty or obligation made by GMAC-RFC in reliance upon any warranty, obligation or representation made by [Gateway] contained by the Client Contract and (v) any untrue statement of a material fact, omission to state a material fact, or false or misleading information provided by [Gateway] in information required under Regulation AB or any successor regulation.

In addition, [Gateway] shall indemnify GMAC-RFC against any and all losses, damages, penalties, fines, forfeitures, judgments, and any other costs, fees and expenses (including court costs and reasonable attorneys' fees) incurred by GMAC-RFC in connection with any litigation or governmental proceeding that alleges any violation of local, State or federal law by [Gateway], or any of its agents, or any originator or broker in connection with the origination or servicing of a Loan.

Id., ¶ 33 (paraphrasing Client Guide A212).

Further, Gateway agreed:

to indemnify and hold GMAC-RFC harmless from and against any loss, damage, penalty, fine, forfeiture, court cost, reasonable attorney's fees, judgment, cost, fee, expense or liability incurred by GMAC-RFC as a result of any material misrepresentation in or omission from any information provided by [Gateway] to GMAC-RFC; or from any claim, demand, defense or assertion against or involving GMAC-RFC based on or grounded upon, or resulting from such misstatement or omission or a breach of any representation, warranty or obligation made by GMAC-RFC in reliance upon such misstatement or omission.

Id. (quoting Client Guide A202).

Gateway conceded that a "certain" number of the loans it sold to RFC were materially defective. Id., ¶ 34.

RFC alleged that at all times it performed all of its obligations to Gateway, if any, under the Agreement, and all conditions precedent to the relief seeks in this action, if any, have been satisfied.  Id., ¶ 35.

The loans sold by Gateway to RFC were deposited into approximately sixty-five RMBS trusts.  Id., ¶ 37.  When RFC sold these loans, it made representations and warranties to the trusts, which included pertinent information about the loans to investors in its RMBS that were made in reliance on information provided by Gateway.  Id.  This information "in many cases" violated Gateway's representations and warranties to RFC.  Id.

RFC alleged that Gateway materially breached its contractual representations and warranties by delivering loans that were not originated or underwritten in accordance with the requirements of the Agreement, did not meet the representations and warranties made as to those loans, or failed to comply with applicable state and federal law.  Id., ¶ 38.

The ResCap Liquidating Trust, on behalf of RFC, investigated Gateway's representations and warranties regarding the properties at issue using the same comparable data that would have been available to Gateway at the time of loan origination through borrowers' tax records and an automated-valuation model ("AVM"), which determines the true market value of a given property at a specific point in time.  Id., ¶¶ 39-41.  The AVM review first conducted retroactive appraisals of the properties using a random sample of 71 of the loans Gateway sold to RFC.  Id., ¶ 41.  This review examined Gateway's appraisal representations that the market value of the mortgaged premises was at least equal to the appraised value stated in the loan appraisal; no fraud

or misrepresentation by the appraiser occurred in the origination of the loans; all information and documents provided to RFC in connection with the loans were complete and accurate; and all data provided by Gateway to RFC relating to any loan was true and complete.  Id., ¶ 41.  The AVM review of the sampled Gateway loans showed that: 43% had reported property values overrepresented by more than 10%; 36% had reported property values overrepresented by more than 15%; 22% had reported loan-to-value ratios ("LTV") (which expresses the amount of mortgage loan as a percentage of the total appraised value of the property) underrepresented by more than 10%; 13% had reported LTV ratios underrepresented by more than 15%; 4% had reported LTV ratios underrepresented by more than 25%; 4% of the loans had actual LTV ratios greater than 100% (the loans were "under water" at origination); 94% had reported combined loan-to-value ("CLTV") ratios (which expresses the amount of all of the loans secured by a property as a percentage of that property's appraised value) underrepresented by more than 15%; 91% had reported CLTV ratios underrepresented by more than 25%; and 62% of the loans had actual CLTV ratios greater than 100%. Id., ¶ 42.  The results of the AVM review showed that Gateway breached the following appraisal representations as set forth in the Client Guide: (i) the market value of the mortgaged premises was at least equal to the appraised value stated in the loan appraisal (Client Guide A202(T)); (ii) no fraud or misrepresentation by the appraiser occurred in the origination of the loans and all information and documents provided to RFC in connection with the loans were complete and accurate (Client Guide A202(KK)); and (iii) all data provided by Gateway to RFC relating to any loan was true and complete (Client Guide A202(A)).  Id., ¶¶ 41, 43.  In addition, 47% of the sampled Gateway loans

failed owner-occupancy tests (which is important because when a property is not owner-occupied, the borrower is more likely to default), and therefore, breached representations (A), (G), and (KK) of Section A202 of the Client Guide. Id., ¶¶ 44-47.

Many of the loans sold by Gateway to RFC defaulted or became seriously delinquent and sustained in aggregate more than $16 million in losses. Id., ¶ 48. The delinquency rates of these loans exceeded what would normally be expected in a given population of mortgage loans. Id., ¶ 49.

RFC also conducted internal loan file reviews after the loans were acquired from Gateway, which showed loans sold to RFC by Gateway violated the Client Guide or other representations or warranties made by Gateway, resulting in an Event of Default under the Agreement. Id., ¶ 50. The small number of Gateway loans audited by RFC revealed problems involving significant misstatements of income and employment information verification, and additional material defects were likely contained throughout the loan population sold to RFC by Gateway. Id., ¶ 51. Further, a number of the loans defaulted shortly after origination, which signals fraud or other problems in the origination or underwriting of the loan. Id. By way of example:

> Loan ID # 10491553 in the amount of $400,000 (included in the securitization RALI 2006-QO4) had such a significant overstatement of income and misrepresentation of job status that the true debt-to-income ratio for the borrower was 149%. This ratio was way in excess of what was permitted under the Client Guide and was a material misrepresentation which made the loan much riskier than Gateway represented. Under Section A202K of the Client Guide, Gateway is responsible for misstatements made by borrowers on loans. Gateway repurchased this loan, acknowledging its material defects; however, RFC has continued to incur additional liabilities and losses stemming from this and similar types of material breaches for which it is still entitled to recover.

Id., ¶ 52.  Many more of the loans sold to RFC by Gateway contained material defects that violated the representations and warranties Gateway made in the Agreement.  Id., ¶ 53.  These defects constituted material breaches of Gateway's representations and warranties, contributing to RFC's exposure to billions of dollars in liability and tens of millions of dollars in legal expenses.  Id., ¶¶ 54-58.

Beginning in 2008 and continuing until it filed for bankruptcy protection on May 14, 2012, RFC faced a number of claims and dozens of lawsuits stemming from the defective loans sold to it by Gateway and others.  Id., ¶ 58.  More than a dozen lawsuits were brought by investors and other participants in the RMBS securitizations, alleging that as many as 98% of the loans contained in the RMBS offerings were defective, and that it had received a certain number of repurchase demands.  Id., ¶¶ 59, 60.

In May 2008, MBIA Insurance Corp., a bond insurer that issued insurance policies guaranteeing the performance of certain mortgage-backed securities issued by RFC, reviewed the loan files, and after applying less stringent representations and warranties that RFC made to MBIA, demanded that RFC repurchase many of the allegedly unidentified defective loans.  Id., ¶ 61.  Ultimately, RFC was obligated to repurchase at least 24% of the loans MBIA claimed were defective.  Id.  MBIA continued its review, and found thousands of defective loans, ultimately resulting in costly litigation, which included several loans obtained from Gateway included in a 2007 transaction:  For example, with respect to Loan #11011563, the borrower represented on the loan application to have an income of $208,800 per year, when the usual salary range for someone in the borrower's field with the borrower's experience and position was $62,628-$72,492; Gateway approved the loan even though it failed to verify two

years' worth of continuous employment as required by the provisions of the RFC Client Guide; and certain fees were not disclosed and the mortgage file was missing a copy of the mortgage.  Id., ¶ 63(a).  Another example of a defective Gateway loan was Loan #11184727, where a 26-year old borrower who claimed to have been employed for 15 years received a second lien loan of $38,500, even though his employment history only showed six years of employment; the borrower claimed on the application income of $114,000 per year as a self-employed computer technician, when the range for technicians with his experience was $44,000-$73,700; and the borrower's credit history showed much smaller credit limits than would be expected for a person making $114,000 per year.  Id., ¶ 63(b).

Beginning in 2008, RFC was sued in multiple actions because of allegedly defective mortgage loans, including those sold to it by Gateway.  Id., ¶ 65.  This included a lawsuit filed by MBIA in October 2008 that challenged RFC's RMBS offerings 2007-HSA1 and HSA2, which included Gateway loans.  Id., ¶ 66, 67, Ex. C.  As part of the MBIA litigation, MBIA hired an expert to review a sampling of loans across the five securitizations involved, including the 2007-HSA1 and HSA2, and the relatively small sample of loans reviewed that were purchased from Gateway.  Id., ¶ 68.  The expert identified over five breaches in each loan involving the appraisals, debt-to-income ratios exceeding the relevant underwriting guidelines, improper loan type under the Client Guide, a mortgage being part of a transaction that was not at arms-length, problems with the mortgage itself, and misrepresentations of income.  Id.

Subsequent to the initiation of the MBIA litigation, the New Jersey Carpenters pension funds filed a lawsuit against RFC relating to 59 mortgage-backed securities

offerings issued through RFC in 2006 and 2007, including Gateway loans. <u>Id.</u>, ¶ 70, Ex. C. The New Jersey Carpenters pension funds alleged that RFC's mortgage loan data was inaccurate due to the inflated appraisal values, inaccurate LTV ratios, borrower income inflation, and other defective underwriting. <u>Id.</u>, ¶ 71. Such data had been represented and warranted by Gateway to be accurate. <u>Id.</u>

In 2011, the Federal Housing Finance Authority (as conservator for Freddie Mac), Allstate Insurance Company and Financial Guaranty Insurance Company, sued RFC relating to loans sold into securitizations, including Gateway loans, concerning loan defects involving misstatements of owner-occupancy and loan-to-value ratios. <u>Id.</u>, ¶¶ 72-74. RFC was also sued by private investors in its RMBS securities and insurers, who alleged RFC sold loans into RMBS securitizations that were defective in a variety of ways, including borrower fraud, missing or inaccurate documentation, fraudulent or inflated appraisals, misrepresentations concerning owner-occupancy, and/or failure to comply with applicable state and federal law. <u>Id.</u>, ¶¶ 75-77.

As of May 2012, RFC had already repurchased millions of dollars of defective loans from its RMBS securitizations and from whole loan purchasers, either at the request of a bond insurer or trustee, or because RFC itself discovered a defect and affirmatively took steps to repurchase the loans. These included loans sold to RFC by Gateway. <u>Id.</u>, ¶ 79.

On May 14, 2012, RFC filed for Chapter 11 bankruptcy protection in the Bankruptcy Court for the Southern District of New York. <u>Id.</u>, ¶ 80. During the bankruptcy proceedings, hundreds proofs of claim were filed on the basis of allegedly defective mortgage loans, including loans sold to RFC by Gateway. <u>Id.</u>, ¶¶ 81-83. The

bankruptcy court ultimately approved a global settlement, including the $10 billion-plus settlement of RMBS-related liabilities. Id., ¶ 85. Under its express contractual obligations, Gateway is obligated to compensate RFC for the portion of the global settlement associated with Gateway's breaches of representations and warranties, as well as for the portion of RFC's other liabilities and losses (including attorneys' fees to defend against, negotiate, and ultimately settle claims relating to allegedly defective loans) associated with Gateway's breaches. Id., ¶ 86. RFC filed the instant lawsuit against Gateway after RFC's RMBS-related liabilities became fixed through confirmation of the Chapter 11 plan and two days before the Plan became effective. Id., ¶ 85.

In Count One, titled "Breach of Contract",[3] RFC alleged that it and Gateway entered into a valid and enforceable Agreement, which resulted in RFC acquiring over 350 mortgage loans from Gateway; Gateway made representations and warranties to RFC concerning the quality and characteristics of the mortgage loans Gateway sold to RFC; "RFC complied with all conditions precedent, if any, and all of its obligations under the Agreement;" Gateway breached its representations and warranties to RFC because the mortgage loans from Gateway materially did not comply with the representations and warranties made by Gateway as to those loans; this material breach constituted an Event of Default under the Agreement; and as the result of Gateway's material breaches, RFC suffered loss, harm, and financial exposure arising from the defective loans, as well as attorneys' fees, litigation-related expenses, and other costs associated

---

[3] While RFC appeared to assert in its brief in opposition to the motion to dismiss that it was asserting a breach of warranty claim, based on RFC's representations during the hearing and this Court's reading of the First Amended Complaint, this Court finds that RFC only asserted a breach of contract claim in this case.

with both defending dozens of lawsuits and proofs of claim filed against RFC.  Id., ¶¶ 88-93.

In Count Two, RFC sought indemnification.  RFC alleged that it incurred liabilities, losses and damages arising from and relating to material defects in the mortgage loans Gateway sold to it, including a portion of the over $10 billion-plus in allowed claims approved by the bankruptcy court, as well as tens of millions of dollars in attorneys' fees, litigation-related expenses, and other costs associated with defending lawsuits and proofs of claim filed against RFC stemming in part from materially defective loans sold to RFC by Gateway.  Id., ¶ 96.  Gateway expressly agreed to indemnify RFC for the liabilities, losses and damages, including attorneys' fees and costs, which RFC incurred.  Id., ¶ 97.

As relief for the breach of contract claim, RFC sought contractual repurchase compensation or damages and an award of attorneys' fees, interest, and costs.  First Amended Complaint, Prayer for Relief.  With regard to the indemnification claim, RFC sought a declaratory judgment that Gateway is responsible to indemnify RFC against judgments, settlements, liabilities, losses, expenses or other damages paid out or to be paid out in settlements or otherwise stemming from Gateway's conduct; an order for damages sufficient to reimburse RFC's liabilities, losses, costs and expenses caused by Gateway's actions; and an award of attorneys' fees, interest, and costs.  Id.

Gateway has moved to dismiss the First Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6).

## II.    STANDARD OF REVIEW

In considering a motion to dismiss under Rule 12(b)(6), the pleadings are construed in the light most favorable to the non-moving party, and the facts alleged in the complaint must be taken as true.  Morton v. Becker, 793 F.2d 185, 187 (8th Cir. 1986).  In addition, a court must afford the plaintiff all reasonable inferences from those allegations.  Blankenship v. USA Truck, Inc., 601 F.3d 852, 853 (8th Cir. 2010).  At the same time, to withstand a motion to dismiss under Rule 12(b)(6), litigants must properly plead their claims under Rule 8 of the Federal Rules of Civil Procedure and meet the principles articulated by the United States Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662 (2009) and Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007).

Under Rule 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The pleading standard articulated by Rule 8 "does not require detailed factual allegations, but it [does demand] more than a unadorned, the-defendant-unlawfully-harmed-me-accusation."  Iqbal, 556 U.S. at 678 (internal quotation marks and citations omitted).  A "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Id. (quoting Twombly, 550 U.S. at 555).  Thus, to "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Id. (quoting Twombly, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678 (citing Twombly, 550 U.S. at 556).  "Determining whether a complaint states a

plausible claim for relief will, . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679.

"Twombly and Iqbal did not abrogate the notice pleading standard of Rule 8(a)(2). Rather, those decisions confirm that Rule 8(a)(2) is satisfied 'when plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Hamilton v. Palm, 621 F.3d 816, 817 (8th Cir. 2010) (quoting Iqbal, 556 U.S. at 678); see also West-Anderson v. Missouri Gaming Co., --Fed. App'x--, 2014 WL 1797180, at *2 (8th Cir. May 7, 2014) ("Iqbal did not abrogate the notice pleading standard of [Rule 8]").

For the reasons set forth below, the Court concludes that RFC's First Amended Complaint is adequate under Rule 8 and Gateway's motion to dismiss should be denied.

III.    **DISCUSSION**

According to Gateway, the First Amended Complaint fails to state a breach of contract and indemnification claim because (1) RFC failed to assert with sufficient specificity that it performed the conditions precedent required by the Agreement between the parties; (2) the First Amended Complaint failed to meet the pleading requirements stated in Iqbal and Twombly as it did not specifically identify the loans giving rise to RFC's claims, failed to sufficiently specify the representations and warranties the loans allegedly breached, and failed to specify how RFC actually suffered damages with respect to the alleged defective loans; and (3) the claims are barred by the statute of limitations. See Defendant Gateway Bank, F.S.B's

Memorandum of Law in Support its Motion to Dismiss Pursuant to F.R.C.P. Rule 12(b)(6) ("Def.'s Mem.") [Docket No. 48], pp. 6-7.

### A. Conditions Precedent

Gateway argued that RFC failed to specify in the First Amended Complaint that it had performed the conditions precedent set forth in Sections A210 and 402 of the Client Guide as required to assert a breach of contract claim. See Def.'s Mem., pp. 6-10. According to Gateway, Section A210 required RFC to provide Gateway with (1) written notice of an Event of Default, and (2) the opportunity to appeal a repurchase demand within thirty days of receipt of the written notice. Id., p. 7. Under Section 402, Gateway claimed that a breach must be determined to be material before RFC's repurchase rights are triggered. Id., p. 8. As to the indemnification claim, Gateway asserted that RFC failed to comply with the notice requirements of Section A212 of the Client Guide prior to bringing its indemnification claim. Id., pp. 9-10.

RFC argued that under Rule 9(c) of the Federal Rules of Civil Procedure, it had adequately alleged that it had complied with all conditions precedent in its First Amended Complaint by alleging that that RFC "'at all times performed all of its obligations to Gateway, if any, under the Agreement, and all conditions precedent to the relief sought in this action, if any, have been satisfied.'" Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss the First Amended Complaint ("Pl.'s Mem.") [Docket No. 56], p. 13 (quoting First Amended Complaint, ¶ 35). Alternately, RFC argued that it was not required to make a repurchase demand or provide notice to Gateway under the terms of the Client Guide. Id., p. 14. In reply, Gateway argued that paragraph 35 of the First Amended Complaint does not meet the pleading requirements

of Rule 9 in light of <u>Iqbal</u> and <u>Twombly</u>, and RFC has misinterpreted its obligations under the Client Guide for providing notice to Gateway before pursuing the present action. <u>See</u> Reply Memorandum of Gateway Bank, F.S.B. in Support of Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) ("Def.'s Reply") [Docket No. 57], pp. 4-10.

This Court concludes that for the purpose of Rule 9(c), RFC has adequately pled that conditions precedent to the relief sought in this action have been satisfied. As stated previously, RFC pled that "at all times performed all of its obligations to Gateway, if any, under the Agreement, and all conditions precedent to the relief sought in this action, if any, have been satisfied." First Amended Complaint, ¶ 35; <u>see</u> <u>also</u>, ¶ 90 (same). Rule 9(c) provides:

> (c) Conditions Precedent. In pleading conditions precedent, <u>it suffices to allege generally that all conditions precedent have occurred or been performed</u>. But when denying that a condition precedent has occurred or been performed, a party must do so with particularity.

Fed. R. Civ. P. 9(c) (emphasis added).

In <u>Cummins Law Office, P.A. v. Norman Graphic Printing Co. Ltd.</u>, 826 F.Supp.2d 1127, (D. Minn. 2011), United States District Judge Richard H. Kyle, addressing a motion to dismiss a breach of contract claim under <u>Iqbal</u>/<u>Twombly</u>, held that the allegation in the complaint that "[a]ny conditions precedent to [its] right to demand performance by [Norman] have been performed," sufficiently pled conditions precedent for the purposes of Rule 9(c). <u>Id.</u> at 1128-29 (citations and marks omitted); <u>see</u> <u>also</u> <u>ORIX Public Finance, LLC v. Lake County Housing and Redevelopment Authority</u>, Civil No. 11–3261 (MJD/LIB), 2012 WL 5382052, at *4-5 (D. Minn. Nov. 1, 2012) (quoting <u>Weitz Co. LLC v. Alberici Constructors, Inc.</u>, No. 8:08CV199, 2009 WL

115980, at *3 (D. Neb. Jan. 16, 2009)) (finding that the plaintiff adequately pled conditions precedent by alleging, "[a]ll conditions precedent to ORIX's claims for relief have been performed or have occurred," and holding that "[s]o long as ORIX has generally alleged that the conditions precedent have occurred, it is 'not required to prove its compliance with conditions precedent to satisfy its pleading obligations.'"). Based on the plain language of Rule 9(c), and the application of this Rule by the courts in this District, the Court concludes that Paragraphs 35 and 90 of the First Amended Complaint adequately alleged that all conditions precedent to the relief sought in this action, if any, have been satisfied, and no more need be pled to meet the requirements of Rule 9(c).

### B. Failure to Identify the Specific Loans and Breaches at Issue

Gateway argued that the First Amended Complaint fails to specify the necessary facts that it breached certain "representations and warranties," as the pleading only makes conclusory assertions regarding the loans sold to RFC by Gateway that violated the Client Guide or other representations or warranties made by Gateway. See Def.'s Mem., pp. 10-11. In addition, Gateway asserted the First Amended Complaint does not provide it with adequate notice of the basic facts supporting RFC's claim, such as which loans were defective, how those loans were defective, what portions of the parties' contract was allegedly breached, and how RFC was allegedly harmed. Id., p. 11. RFC countered that the First Amended Complaint contains plausible allegations that Gateway made numerous material representations and warranties to RFC concerning the loans Gateway sold to it; Gateway contractually agreed to various remedies for any breach of its representations and warranties, including broad indemnification provisions;

Gateway's loans in fact contained numerous breaches of the representations and warranties; and RFC has been damaged as a result of Gateway's breaches. See Pl.'s Mem., pp. 15-17. In addition, RFC claimed that it is not required to plead the alleged defect as to each of the more than 350 loans at issue, and that Gateway ignores controlling precedent that under its Client Guide, RFC has the sole discretion to determine whether an Event of Default has occurred, and the lender cannot challenge that determination, thereby negating the need for RFC to prove the existence of specific breaches by Gateway. Id., pp. 18-21 (citing Residential Funding Co. v. Terrace Mortg. Co., 850 F. Supp.2d 961 (D. Minn. 2012), aff'd, 725 F.3d 910 (8th Cir. 2013)).[4] RFC further asserted that because sampling can be used as a method of proof of loan defects, it not necessary to plead every breach with respect to each and every loan in the First Amended Complaint. Id., pp. 22-23.

---

[4]    In Terrace, RFC sued the defendant because it refused to repurchase thirteen loans. Terrace, 850 F. Supp.2d at 963. RFC claimed that the defendant breached its contract with RFC and sought indemnification from the defendant for its attorney's fees and costs. Id. at 964. On summary judgment, the defendant argued that RFC had no unilateral right to demand repurchase of the loans. Id. at 965. Terrace acknowledged that it read the client guide that gave RFC the exclusive right to declare an event of default. Id. at 966. The district court rejected the defendant's argument that "[a]llowing RFC to recover simply because it demanded repurchase would effectively allow RFC to force Terrace to take back any and every loan that Terrace ever sold to RFC, at RFC's whim. RFC could require a repurchase of any loan, whether there was a default or not, regardless of its motives." Id. at 968. The district court concluded that "the plain meaning of the agreement allows for Residential right to demand that Terrace repurchase loans that Residential, in its sole determination, has concluded are non-conforming. Insofar as its objection to the repurchase provisions is that there is no mechanism for judicial review of Residential determination that Terrace must repurchase a loan, a party to a contract is free to expressly provide for a forum for judicial review or to relinquish any right of action in the courts, as is evident by the validity of arbitration agreements." Id.

The Eight Circuit affirmed, finding that "the Client Guide gives [RFC] the 'sole discretion to determine whether an Event of Default occurred." Terrace, 725 F.3d at 916.

This Court rejects Gateway's contention that the First Amended Complaint failed to meet Rule 8(a) standards by failing to list each and every Gateway loan at issue, the specific provisions of the Client Guide that each loan allegedly breached, and how each loan breached that particular provision. First, federal pleading standards simply do not demand that level of detail. As noted above, Iqbal and Twombly did not abrogate notice pleading under Rule 8(a). Rather these seminal cases require that the First Amended Complaint contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570). Second, Gateway did not cite a single case in which a court in a factually similar situation – i.e. where so many loans were at issue – has demanded that each and every allegedly defective loan, along with each and every provision breached, be described in a complaint for the pleading to pass Rule 8(a) scrutiny.

In Ace Securities v. DB Structured Prods., Inc., --F. Supp.2d--, 2014 WL 1116758 (S.D.N.Y. Mar. 20, 2014), a case relied upon by RFC, the court considered a motion to dismiss pursuant to Rule 12(b)(6) based on the defendant's argument that the plaintiff failed to provide adequate notice of the loans the plaintiff alleged were in breach of certain representations and warranties that it made at closing when the loans were securitized into various trusts. Id. at *4. The court stated:

> [Defendant] cites only one RMBS case to the contrary, Central Mortgage Co. v. Morgan Stanley Mortgage Capital Holdings, No. 5140–CS, 2012 WL 3201139 (Del. Ch. June 22, 2012), but its reliance on that case is misplaced. Although Central Mortgage Co. primarily involved the "relation back" doctrine with respect to a statute of limitations, it does contain language stating that loan-by-loan breach allegations are required at the motion-to-dismiss stage. See id. at *18–19. However, the court also made clear that it was applying a Delaware pleading standard that

> requires "specific facts that make out a cause of action." Id.
> at *13. That standard is higher than the one applied in
> federal court. See, e.g., Erickson v. Pardus, 551 U.S. 89, 93,
> 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (stating that under
> Rule 8(a)(2), "[s]pecific facts are not necessary," and that a
> complaint need only "give the defendant fair notice of what
> the ... claim is and the grounds upon which it rests." (quoting
> Twombly, 550 U.S. at 555, 127 S.Ct. 1955) (internal
> quotation marks omitted)). Accordingly, Central Mortgage
> Co. does not provide a persuasive basis for DBSP's
> argument that Plaintiff's allegations do not meet federal
> pleading standards.

Id. at *13.

The court further noted that its conclusion that the complaint was adequate under Rule 8(a) "notably does not relieve Plaintiff of its burden of proving loan-by-loan breaches at later stages of litigation." Id. (emphasis added).

Gateway attempted to distinguish Ace on the ground that the plaintiff in Ace had provided pre-suit notice of the loans it claimed breached the parties' agreement and because the parties alleged "which representations were breached and how." Def.'s Reply, p. 14 (quoting Ace Securities, 2014 WL 1116758, at *4, *12). Ace did not turn on the pre-suit notification issue. Rather, the court merely determined that for the purposes of a motion to dismiss, "loan-by-loan allegations are not required at this stage." Id. at *18, n.5.; see also Bank Hapoalim B.M. v. Bank of Am. Corp., No. 652678/2011, 2012 WL 6814194, at *7 (CD Cal Dec. 21, 2012)[5] ("There is no need to allege that the specific loans backing a plaintiff's securities contained underwriting defects. Given that legal standard, the Court considers the allegations in the Complaints plausible. The

---

[5]     Gateway attempted to distinguish this case because it dealt with a claim of fraud. See Def.'s Reply, p. 16. If anything, the fact that Bank Hapoalim B.M. dealt with a fraud claim, which would require pleading with particularity, gives it more weight in a Rule 8 case.

Complaints give rise to the inference that the mortgage originators deviated from stated underwriting guidelines in large numbers of cases, and that Defendants knew of such deviation.") (internal citation omitted); Employees' Retirement Sys. v. J.P. Morgan Chase & Co., 804 F. Supp.2d 141, 152 (S.D.N.Y. 2011) (denying in part defendant's motion to dismiss pursuant to Rule 12(b)(6) plaintiff's allegations regarding deviations in underwriting standards and noting "[a] plaintiff need not allege that any particular loan or loans were issued in deviation from the underwriting standards, so long as the complaint alleges widespread abandonment of underwriting guidelines.") (quoting Tsereteli v. Residential Asset Securitization Trust 2006–A8, 692 F. Supp.2d 387, 392 (S.D.N.Y. 2010)) (internal marks omitted)).

Similarly, in Oklahoma Police Pension & Retirement System v. U.S. Bank Nat'l Ass'n., 291 F.R.D. 47 (S.D.N.Y. May 31, 2013), another case relied upon by RFC, the court found that regardless of the fact that the complaint was not a "model of clarity" and the plaintiff's failure to show that any of the specific mortgages at issue were, in fact, defective, the general allegations in the complaint "render[ed] plausible" plaintiff's claim that the issuer breached its obligations:

> The Complaint is not a model of clarity because while a default requires action or inaction by the issuer the Complaint alleges that there were numerous defaults, including failures by EMC, the seller, to cure defects in the mortgage loans and/or to substitute conforming loans. (Compl. ¶ 94.) However, the Complaint also alleges numerous defaults by the issuer. In particular, it alleges that the issuer breached its obligation under the Indenture to require EMC to abide by its representations and warranties with respect to the mortgage loans and to cure, substitute, or repurchase nonconforming mortgage loans. (Compl. ¶¶ 94, 103; Indenture §§ 3.04(a), 3.06; see SSA § 2.03(b).)

The defendant argues that the plaintiff has failed to allege the specific facts necessary to show that any of the mortgages conveyed to the trust were in fact defective. (Def.'s Mem. in Supp. Mot. to Dismiss ("Def. Mem.") at 12, 16–17.) However, undisputed allegations in the Complaint render plausible the plaintiff's claim that the issuer breached its obligations in violation of the Indenture. Specifically, the plaintiff has alleged and the defendant does not dispute that the Covered Trusts performed extremely poorly, that there is documented evidence of irregularities in other, similar trusts, and that the seller repurchased less than 1% of the mortgage loans in the Covered Trusts.

\* \* \*

Therefore, there are sufficient plausible allegations that defaults occurred. . . .

Id. at 66-67 (emphasis added).[6]

Gateway relied on Motley v. Homecomings Fin., LLC, 557 F. Supp.2d 1005, 1012 (D. Minn. 2008) in support of its position that RFC was required to plead the specific mortgages at issue. Def's. Mem., p. 13. But Motley involved only five loans and plaintiffs failed to plead the terms of any of the contracts, making it impossible for the defendant to discern how it breached the contracts. Id., at 1013. Moreover, unlike here, the complaint in Motley did not quote or attach the contract provisions at issue. Id.

Gateway also relied on Wells Fargo Bank, N.A. v. LaSalle Bank, N.A., No. 11 C 2884, 2011 WL 4837493 (N.D. Ill., Oct. 11, 2011) for the position that dismissal of the plaintiff's breach of contract claims is appropriate because the First Amended Complaint did not "allege the ways" in which the particular warranties were breached. Def's.

---

[6]     While Gateway argued that the finding in the Oklahoma Police Pension case was dependent on the court finding that the information was at that stage uniquely in the possession of defendants, the Court finds that the holding that case was not dependent on this fact, as the court was merely quoting a proposition made by a different court. Oklahoma Police Pension, 291 F.R.D. at 70 (quoting Policemen's Annuity & Benefit Fund v. Bank of Am., NA, 943 F. Supp.2d 428 (S.D.N.Y. May 6, 2013).

Mem., p. 12.  In <u>LaSalle</u>, the court dismissed two of the three claims asserted in the complaint where there was no allegation regarding how the at-issue warranties were breached.  <u>LaSalle Bank, N.A.</u>, 2011 WL 4837493, at *3.  Nothing in the court's opinion, however, suggests that the plaintiff was required to allege specific defects in each of the subject loans.  Indeed, as to the groups of loans at issue in <u>LaSalle Bank, N.A.</u>, totaling more than $800 million, the plaintiff was not required to list the defect as to every loan. Instead, the court found that it was sufficient that the plaintiff alleged "ways in which LaSalle failed to comply with industry standards.  For example, LaSalle is alleged to have failed to inspect the collateral properties, failed to analyze the operating statements and rent rolls for the collateral properties and failed to analyze the financial condition of borrowers."  <u>Id.</u>  As to the claims that were dismissed, unlike the First Amended Complaint, the court noted that the plaintiff failed to include the relevant language of the loans at issue in order to provide notice of the duty of the defendant or failed to allege anyway how the appraisal process for the loans at issue violated the requirements of the Financial Institutions Reform, Recovery and Enforcement Act.  <u>Id.</u> That is not the case here.

"A successful breach-of-contract claim under Minnesota law[7] has four elements: (1) formation of a contract; (2) performance by plaintiff of any conditions precedent; (3) a material breach of the contract by defendant; and (4) damages."  <u>General Mills Operations, LLC v. Five Star Custom Foods, Ltd.</u>, 703 F.3d 1104, 1107 (8th Cir. 2013) (citation and internal quotation marks omitted).  In this case, RFC has alleged facts to support the formation of a contract between it and Gateway and the pertinent provisions

---

[7]    The parties do not contest the fact that Minnesota law applies to the claims in this action.

of the Agreement at issue (First Amended Complaint, ¶¶ 17, 18); that it satisfied any conditions precedent (id., ¶¶ 35, 90); the various provisions that of the Agreement that Gateway breached and the basis for reaching that determination (id., ¶¶ 38-54); and that RFC has suffered damages caused by Gateway's breach (id., ¶¶ 57, 58, 65, 83-86). In sum, Gateway has been alerted to the fact that RFC is alleging that some of the loans Gateway originated are defective (and thereby in breach of the Agreement) and defective in very specific ways pursuant to specific provisions of the Client Guide, such as overstated property values, misrepresented owner occupancy status and misrepresented borrower income. Id., ¶¶ 37, 38, 41, 42, 43, 44-47. Additionally, RFC set out various reasons for concluding that many of the loans were defective, gave Gateway examples of loans it considered defective, and described the representations and warranties it alleged Gateway breached. Id., ¶¶ 24, 25, 39-47, 50-52, 62, 63, 68, 70, Ex. C. Further, RFC provided a causal link between the breach and the alleged harm arising out of identified claims against it by third-parties, which contributed to the $10 billion-plus settlement of RMBS-related liabilities. Id., ¶¶ 57, 58, 65, 83-86.

Just as in a class action suit, where a plaintiff need not identify in its complaint each and every member of the class and how each and every potential member was actually damaged by the conduct of the defendant, here too, RFC will not be required to make such a showing in its First Amended Complaint. Whether at some later stage RFC will be compelled or able to show exactly which Gateway loans are defective and how – whether such proof is offered through a loan-by-loan analysis or through statistical sampling – does not impact the Court's conclusion that RFC is not required to plead loan-by-loan at this stage of the case. Those are issues that must be reserved for

discovery. The undisputed allegations in the First Amended Complaint render plausible RFC's claim that Gateway breached its obligations to RFC under Minnesota law. RFC's allegations were supported with "sufficient factual matter" as contemplated by Iqbal and are a far cry from the "threadbare recitals of the elements of a cause of action" that Iqbal prohibits. Iqbal, 556 U.S. at 678.

Lastly, Gateway's insistence that the First Amended Complaint is defective because it does not give notice of how each of the loans breached the Agreement fails to acknowledge RFC's unilateral right to declare an Event of Default pursuant to the Client Guide. See Terrace, 725 F.3d at 916 ("The Client Guide gives [RFC] 'sole discretion' to determine whether an Event of Default has occurred."). The parties' respective rights and duties under the Client Guide will be the subject of discovery, but at this point, Gateway has not pointed to any authority to show that RFC was obligated to identify the underlying cause of an Event of Default for each loan.

### C.     Failure to Identify the Applicable Version of the Client Guide

Gateway argued that RFC's First Amended Complaint was subject to dismissal because it does not know which version of the Client Guide is applicable to the allegedly defective loans. Def's Mem., p. 2. This argument by Gateway is meritless. The First Amended Complaint cited to specific provisions of the Client Guide relevant to its claims (First Amended Complaint, ¶¶ 24(a)-(m), 26-29, 31-33), attached copies of the relevant provisions (id., ¶ 18; Ex. B1-B7), and alleged that the "omitted portions of the Client Guides do not affect the obligations set forth in this Amended Complaint." Id., ¶ 18. Gateway has been apprised of the operative provisions of the Client Guide upon which

RFC was relying, regardless of the number of versions of the Client Guide that might exist.

**D.** **Statute of Limitations**

It is Gateway's position that any breach of contract and dependent indemnification claims, based on the loans listed in Exhibit C to the First Amended Complaint, are barred by the applicable six-year statute of limitations under Minn. Stat. § 541.05, subd. 1(1) for contract actions. See Def.'s Mem., p. 14. According to Gateway, the last loan it delivered to RFC occurred on August 1, 2007, and the present action was filed in December 2013. Id., p. 15. Gateway maintained that the action accrued upon the alleged date of breach, which would have been upon delivery of the loans to Gateway. Id., pp. 15-16.

In response, RFC argued that 11 U.S.C. § 108(a) extended the underlying six-year statute of limitations for up to two years after the date of the filing for bankruptcy on May 14, 2012. See Pl.'s Mem., pp. 23-24. As to the indemnification claim, RFC argued that the six-year statute of limitations did not begin to run until the underlying liability of the party seeking indemnification became fixed or ascertained through a settlement or judgment, which in this case would have been during the bankruptcy proceedings, which began in May 2012. Id., pp. 24-25.

In reply, Gateway contended that the statute of limitation for indemnification claims is dependent on the gravamen of such a claim—in this case breach of contract—and therefore, accrues upon breach even though actual damages occurred later. See Def.'s Reply, p. 22-25.

"If applicable nonbankruptcy law . . . fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before  . . . two years after the order for relief."  11 U.S.C. § 108(a)(2).   In addition, the Bankruptcy Code provides that a debtor in possession shall have all of the rights of a trustee:

> Subject to any limitations on a trustee serving in a case under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights, other than the right to compensation under section 330 of this title, and powers, and shall perform all the functions and duties . . . of a trustee serving in a case under this chapter.

11 U.S.C. § 1107(a) (emphasis added); see also In re Hen House Interstate, Inc., 177 F.3d 719, 723 n.4 (8th Cir. 1999) ("The express language of § 1107(a) therefore compels the unremarkable conclusion that Chapter 11 debtors in possession may do most of the things trustees may do.").

The Court concludes that although the language of § 108(a)(2) only refers to a trustee, the plain language of § 1107(a) grants a Chapter 11 debtor in possession all of the rights of a Chapter 11 trustee, with the exception of the right of compensation. Therefore, the Court finds that RFC as a "debtor in possession," is entitled to the benefit of a § 108(a) extension of time to commence suit.  This finding is supported by the Eighth Circuit's decision in Johnson v. First Nat'l Bank of Montevideo, 719 F.2d 270 (8th Cir. 1983), where the court found that a debtor in possession had the same right as a trustee pursuant to of § 108(b) to a stay of the redemption period under § 1107(a).  Id. at 277-78, n. 11.  Although that case pertained to § 108(b), which deals with deadlines to provide notice, as opposed to § 108(a) that deals with the commencement action, the Court finds no material difference between the two provisions, and that a debtor in

possession has a right to the two-year extension of a claim's statute of limitations to the extent it has not expired before the bankruptcy petition. Indeed, the Eighth Circuit in Johnson concluded that, "[a]lthough the language of § 108 refers only to the trustee, it is generally agreed that the debtor-in-possession is also entitled to the statute's privileges." Id. at 278 n.11. Further, other cases that examined this issue under § 108(a) have concluded that in a Chapter 11 bankruptcy, the debtor, as a "debtor in possession," is entitled to the benefit of a § 108(a) extension. See Coliseum Cartage Co. v. Rubbermaid Statesville, Inc., 975 F.2d 1022, 1025 (4th Cir. 1992) ("Title 11 U.S.C. § 108(a) grants the trustee in bankruptcy a two-year extension of the limitation period, and 11 U.S.C. § 1107 accords a debtor-in-possession the rights and powers of a trustee."); In re O.E.M./Erie, Inc., 405 B.R. 779, 787 (Bkrtcy. W.D. Pa. 2009) ("Since 11 U.S.C. § 1107 vests with the Chapter 11 debtor all of the rights and powers of a trustee (except the right to compensation), courts have held that a Chapter 11 debtor-in-possession has the same rights as the trustee under 11 U.S.C. § 108(a).") (citing Roach v. Option One Mortg. Corp., 598 F. Supp.2d 741, 756 n. 23 (E.D. Va. 2009); North Penn Transfer, Inc. v. Victaulic Co. of America, 859 F. Supp. 154 (E.D. Pa.1994)) (citation omitted); In re Ranasinghe, 341 B.R. 556, 564 (Bankr. E.D. Va. 2006) (observing that Chapter 11 debtor in possession is "clearly entitled to the benefit of the § 108(a) extension"); North Penn Transfer, Inc. v. Victaulic Co. of America, 859 F. Supp. 154, 164 (E.D. Pa. 1994) ("The Bankruptcy Code extends for two years from the order for relief in a bankruptcy proceeding the time within which a debtor-in-possession may file any cause of action on behalf of an estate.").

Because the applicable six-year statute of limitations had not expired prior to the filing of the voluntary petition on May 14, 2012, with regard to the loans delivered by Gateway to RFC as far back as May 14, 2006, the two-year extension provision of §108(a)(2) applies to the contract claim. As the instant action was filed in December 2013, well before the two-year period had expired after any final order of relief in the bankruptcy case, the Court concludes that the breach of contract claim is not barred by the statute of limitations as to loans acquired by RFC from Gateway as far back as May 14, 2006.

Even if the bankruptcy statutes did not extend the six-year statute of limitations, or RFC's breach of contract claim included loans acquired before May 14, 2006, the Court concludes that there remains a question of fact as to whether RFC's breach of contract claim based on these loans is barred by the statute of limitations. This is because the notice requirements of the Client Guide provide:

> Client will comply with all provisions of this Client Guide and the Program Documents, and will promptly notify GMAC-RFC of any occurrence, act, or omission regarding Client, the Loan, the Mortgaged Property or the Mortgagor of which Client has knowledge, which occurrence, act, or omission may materially affect Client, the Loan, the Mortgaged Property, or the Mortgagor.

See First Amended Complaint, Ex. B-1 (A210(M)). Further, the Client Guide requires the following of Gateway, "[i]f the Client discovers an Event of Default, it should give GMAC-RFC prompt written notice. Such notice should include a written description of the Event of Default." Id. (A210(A)).

Failure to perform under a contract when performance is due establishes an immediate breach. Park Nicollet Clinic v. Hamann, 808 N.W.2d 828, 837 (Minn. 2011)

(citation omitted). While any breach as to the warranties and representations of the Agreement would have occurred upon the loans' delivery to RFC, whether Gateway knew that the loans were defective and thereby had a duty under the Agreement to report this to RFC, is a separate question. In sum, the dates upon which Gateway discovered the Event of Default, and its duty to notify RFC of this event was triggered, is an issue that will have to be ascertained during discovery.

As for Gateway's contention that the statute of limitations has run on the indemnification claim because the statute of limitations for the underlying breach of contract claim has expired, even if this Court had concluded that the breach of contract claim was barred by the statute of limitations, the indemnification claim is nevertheless timely. "The statute of limitations in an indemnification case ordinarily is six years after final judgment or settlement." Hernick v. Verhasselt Const., Inc., No. CX-02-1424, 2003 WL 1814876, at *5 (Minn. Ct. App. April 8, 2003) (citing Oanes v. Allstate Ins. Co., 617 N.W.2d 401, 403 (Minn. 2000)); see also Minn. Stat. § 541.05, subd. 1 (providing that contract actions shall be brought within six years). Contrary to Gateway's assertion, the statute of limitations for the indemnification is not governed by the date of its alleged malfeasance as to the loans. This is because the duty to indemnify in this case is itself a contractual requirement with duties different from those set forth with regard to the non-indemnification warranties and representations in the Client Guide. Fallon McElligott, Inc. v. Seaboard Sur. Co., 607 N.W.2d 801, 803 (Minn. Ct. App. 2000) (citing Meadowbrook, Inc. v. Tower Ins. Co., 559 N.W.2d 411, 415 (Minn. 1997)) (finding that the duty to indemnify is contractual). In general, the statute of limitations begins to run when a cause of action accrues, or when there is a demand capable of present

enforcement.  <u>Noske v. Friedberg</u>, 656 N.W.2d 409, 412 (Minn. Ct. App. 2003) ("A cause of action accrues when all of its elements exist to the extent that the claim could withstand a motion to dismiss for failure to state a claim upon which relief can be granted."), <u>aff'd</u>, 670 N.W.2d 740 (Minn. 2003).  The breach of contract claim as to the indemnification provisions of the Client Guide could not accrue until a third-party received a remedy from RFC arising out of the Gateway loans, and could not have accrued when Gateway breached its contractual representations and warranties by delivering loans that violated the requirements of the Agreement, as RFC had yet to incur any damages for which it could seek indemnification.  <u>See</u> <u>Jacobson v. Bd. of Trustees of Teachers Retirement Ass'n</u>, 627 N.W.2d 106, 110 (Minn. Ct. App.2001), <u>rev.</u> <u>denied</u> (Minn. Aug. 15, 2001) (finding that under Minnesota law, a cause of action in contract accrues at the time of breach); Restatement (Second) of Contracts § 235(2) (1981) (stating that "[w]hen performance of a duty under a contract is due any non-performance is a breach").

RFC asserted indemnification for liabilities and losses that were primarily ascertained during the bankruptcy proceeding filed in 2012 and ultimately determined upon approval of the plan which was deemed effective in December 2013.  RFC filed this action in December 2013.  Therefore, RFC's claim for indemnification is not barred by the statute of limitations and Gateway's motion to dismiss the indemnification claim fails.

### E. RFC's Late-Submitted, Additional Authority

On May 16, 2014, RFC requested permission to submit a list of seventeen additional cases in support of its opposition to Gateway's Motion to Dismiss.[8]

The Court granted RFC permission to file its list and provided Gateway with an opportunity to respond to RFC's newly disclosed authorities. Gateway filed a response on May 22, 2014. <u>See</u> Docket No. 61.

The Court has independently reviewed all of the additional cases cited, along with Gateway's letter in response, and concluded that none of them, except for the <u>Cummins Law Office, P.A.</u> and <u>ORIX Public Finance</u> cases were helpful or informative in deciding Gateway's motion.

## IV. RECOMMENDATION

For the reasons set forth above, it is recommended that:

1. Defendant Gateway Bank F.S.B.'s Motion to Dismiss for Failure to State a Claim [Docket No. 19] be **DENIED** as moot; and

2. Defendant Gateway Bank F.S.B.'s Motion to Dismiss Plaintiff's First Amended Complaint [Docket No. 46] be **DENIED**.

Dated:     May 30, 2014

s/ <i>Janie S. Mayeron</i>
JANIE S. MAYERON
United States Magistrate Judge

---

[8]     Another version of this submission, dated May 22, 2014, was filed on CM/ECF as Docket No. 60 and contained nineteen total cases. The two additional cases, <u>Cummins Law Office, P.A.</u> and <u>ORIX Public Finance, LLC</u>, <u>supra</u>, dealt with pleading of conditions precedent under Rule 9(c) that RFC referenced during the hearing.

## NOTICE

Under D. Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **June 6, 2014**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. A party may respond to the objecting party's brief by **June 13, 2014**. All briefs filed under this Rules shall be limited to 3500 words. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.